***********
Upon review of the competent evidence of record, with reference to the errors assigned, and considering the briefs and oral arguments of the parties, the Full Commission finds no good grounds to receive further evidence, or to rehear the parties or their representatives. Upon reconsideration of the evidence, the Full Commission affirms with modifications, the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into at the hearing as:
 STIPULATIONS *Page 2 
1. Plaintiff contends that she sustained an occupational disease arising out of and in the course of her employment with Defendant-Employer on September 23, 2008. Defendants deny that Plaintiff sustained a compensable occupational disease as alleged.
2. On September 23, 2008, Defendant-Employer was subject to the North Carolina Workers' Compensation Act, and the North Carolina Industrial Commission has jurisdiction of this matter.
3. On September 23, 2008, Defendant-Carrier provided workers' compensation insurance coverage to Defendant-Employer.
4. On September 23, 2008, an employment relationship existed between the parties.
5. Plaintiff's average weekly wage is $451.56, yielding a compensation rate of $301.06.
6. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One: Pre-Trial Agreement;
 b. Stipulated Exhibit Two: North Carolina Industrial Commission forms and filings;
 c. Stipulated Exhibit Three: Plaintiff's medical records;
 d. Stipulated Exhibit Four: Defendant-Employer's employment and payroll records for Plaintiff;
 e. Stipulated Exhibit Five: Discovery responses;
 f. Stipulated Exhibit Six: Additional medical records of Plaintiff.
 *********** ISSUES *Page 3 
The issues to be determined are:
 1. Whether Plaintiff's carpal tunnel syndrome is a compensable occupational disease?
 2. Whether Plaintiff is entitled to any workers' compensation benefits?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 44 years old, with a date of birth of June 3, 1966. Plaintiff is approximately five feet, four inches tall and has an employment history of holding numerous positions in the production, manufacturing, and assembly industries requiring repetitive use of her hands.
2. On or about September 2, 2008, Plaintiff began working for Defendant-Employer, a temporary staffing agency. Defendant-Employer assigned Plaintiff to work at ASC Signal, a company which makes satellite dishes. Plaintiff's duties at ASC Signal involved the producing and packaging of satellite dishes on an assembly line.
3. According to Plaintiff, her duties at ASC Signal consisted almost entirely of making cardboard boxes and building mounting brackets for the satellites using an air powered "screw gun." When assembled, the cardboard boxes that Plaintiff worked with were approximately four feet long by four feet wide and two feet high. Prior to assembly, the cardboard boxes remained stacked on pallets six feet high. In order to assemble the cardboard boxes, Plaintiff would remove the top flattened box from a pallet, unfold the flaps and corners, and then bend and push down inserts for each box. Plaintiff did not know the approximate weight of the cardboard boxes, but she described them as being "heavy." *Page 4 
4. Plaintiff's employment at ASC Signal required her to rotate to various stations. At one particular station where Plaintiff worked, she operated a screw gun in order to build mounting brackets for satellites. According to Plaintiff, when she used the screw gun, it would exert force into her wrists. Plaintiff estimated that she spent as much as two to four hours per day operating the screw gun while working at ASC Signal.
5. Ms. Crystal Braswell is the manager of Defendant-Employer's Smithfield office, and visited ASC Signal on a monthly basis. During her visits she had the opportunity to observe the assembly line in operation on many occasions. Ms. Braswell described the assembly line at ASC Signal as involving several work stations through which employees rotated every two hours.
6. Ms. Jacquan Denise Harrell worked with Plaintiff daily at ASC Signal in September 2008. According to Ms. Harrell, Plaintiff indicated that she had been having problems with her hands for a long time that started prior to her work at ASC Signal when she worked at Butterball, a turkey plant, where she had to lift turkeys up and put them on a hook. Ms. Harrell described the assembly line at ASC Signal as consisting of six or seven work stations which spanned an area of approximately 50 feet that provided an unobstructed view of each work station. She indicated that each employee rotated work stations every two hours at the direction of the team leaders. Ms. Harrell observed Plaintiff working at all of the work stations on the assembly line and she did not observe her at a single work station for any longer than two hours at one time.
7. According to Ms. Harrell, only one of the work stations at ASC Signal involved the use of an air-powered screw gun. The duties at this particular work station involved assembling mounting brackets weighing approximately three pounds that would attach the *Page 5 
satellite to a stationary object. Building these mounting brackets required the insertion of up to three screws with an air-powered screw gun which remained suspended overhead with an air hose. Ms. Harrell described the use of the air-powered screw gun as "easy," requiring her to press a button until the screw gun automatically stopped. In addition, Ms. Harrell explained that during the operation of the air-powered screw gun, she and the other employees wore gloves, the screw gun did not jerk or recoil during use, and it stopped "slowly and gradually."
8. At the work station where cardboard boxes were assembled, Ms. Harrell estimated that she would build approximately 100 boxes of several different sizes per hour. Plaintiff estimated that she would build between 110 and 120 cardboard boxes per hour.
9. The Full Commission gives greater weight to the testimony of Ms. Harrell over any contrary opinions of Plaintiff relating to the duties performed by employees at ASC Signal on its assembly line.
10. According to Plaintiff, she experienced bilateral hand/wrist pain during her first week at ASC Signal in September 2008. Plaintiff's pain progressed to a feeling of swelling, and by her third week at ASC Signal she was experiencing numbness requiring her to shake her fingers to regain sensation. Plaintiff reported her hand/wrist complaints to her immediate supervisor, who suggested that she seek medical treatment, but did not refer her to any specific physician.
11. According to Plaintiff, she never experienced hand/wrist pain or other symptoms prior to September 2008, and was not diabetic, pregnant, or suffering from hypothyroidism or rheumatoid arthritis as of September 2008. The Full Commission gives greater weight to the testimony of Ms. Harrell that Plaintiff indicated to her that she had been having problems with her hands for a long time that started prior to her work at ASC Signal. *Page 6 
12. On September 23, 2008, Plaintiff presented to the emergency department of Johnston Memorial Hospital in Smithfield, North Carolina, where she received a diagnosis of carpal tunnel syndrome, prescriptions for pain and other medications, instructions to follow up with her primary care physician, and instructions to remain out of work for two days. Plaintiff also received a carpal tunnel syndrome fact sheet that stated "CTS is especially common in those performing assembly work. . . ." Indeed, CTS "is three times more common among assemblers than among data-entry personnel." Other factors listed on the fact sheet associated with carpal tunnel syndrome included repeated use of vibrating hand tools, work stress and trauma, or injury to the wrist that causes swelling. Non-work-related contributory conditions listed on the fact sheet included pregnancy, diabetes, hypothyroidism, and rheumatoid arthritis.
13. Plaintiff received her next treatment for carpal tunnel syndrome through an urgent care facility selected by Defendant-Employer. At the urgent care facility, Plaintiff received a splint and medication. Plaintiff continued to work with restrictions while undergoing treatment at the urgent care facility.
14. On November 11, 2008, Plaintiff presented to Dr. Robert Albert Appert, an orthopaedist, with complaints of bilateral numbness and tingling of the hands "for several months." Dr. Appert diagnosed Plaintiff with "full blown carpal tunnel syndrome, Stage II." Based upon Dr. Appert's diagnosis of Stage II carpal tunnel syndrome, he felt that conservative treatment was a "waste of time," and that immediate surgery was necessary.
15. On December 29, 2008, Plaintiff underwent bilateral carpal tunnel release surgery performed by Dr. Appert. He kept Plaintiff out of work post-operatively until February 18, 2009, when he released her to return to work without restrictions. According to Plaintiff, she *Page 7 
was aware that she did not have any specific work restrictions, and that she could try to work and let Dr. Appert know if she had any problems.
16. Plaintiff notified Defendant-Employer of her availability for employment, but received no offers of employment. Beginning in March 2009, Plaintiff undertook an employment search on her own through newspapers, which included an application at the Dollar Tree discount store. In March or April 2009, Plaintiff applied for unemployment compensation. Sometime in April 2009, Plaintiff began receiving unemployment compensation at the rate of $90.00 per week. As of the date of the hearing before the Deputy Commissioner, it was Plaintiff's belief that she had 11 weeks of unemployment benefits remaining.
17. Plaintiff acknowledged certifying that she was able to work on her application for unemployment compensation. Plaintiff believed that she was capable of trying to work, but that she should report any associated problems with returning to work to Dr. Appert. In order to obtain and maintain unemployment compensation, Plaintiff has been seeking suitable employment, including submitting at least two applications per week to prospective employers, since March or April 2009. As of the date of the hearing before the Deputy Commissioner, Plaintiff's efforts to obtain suitable employment remained unsuccessful.
18. As Plaintiff became more active following her release by Dr. Appert, she noticed recurrent symptoms, sometimes associated with such activities as carrying her grandchild. Plaintiff attempted to return to Dr. Appert. Because Defendants denied the compensability of Plaintiff's workers' compensation claim, she was unable to pay for a return visit to Dr. Appert.
19. As of the date of the hearing before the Deputy Commissioner, Plaintiff continued to have daily pain in her wrists varying in intensity from a two to an eight on a pain scale of zero to 10, with 10 being the worst pain. Plaintiff also has numbness and swelling early in the *Page 8 
morning, and has to shake her hands to regain sensation. Although Plaintiff is currently taking over-the-counter medication for her bilateral hand/wrist complaints, she would like to return to Dr. Appert for additional treatment.
20. Plaintiff failed to prove that her bilateral carpal tunnel syndrome is a compensable occupational disease. At his deposition, Dr. Appert opined that Plaintiff's carpal tunnel syndrome was "fairly progressive as opposed to something that had just begun" when he first saw her on November 11, 2008. After Plaintiff's counsel offered a hypothetical description of Plaintiff's job duties, and asked Dr. Appert's opinion on whether the employment placed Plaintiff at a greater risk of contracting carpal tunnel syndrome than the general public, Dr. Appert responded: "she has occupationally-induced carpal tunnel syndrome, for the simple reason that she [was] doing a repetitive-motion occupation, but aggravated by the fact that she [was] using a power screw driver." According to Dr. Appert, any kind of power equipment that vibrates in the hand will exacerbate carpal tunnel syndrome and bring on symptoms much earlier than a piece of equipment that is not power operated. Dr. Appert's response did not address whether Plaintiff's job duties placed her at an increased risk for contracting carpal tunnel syndrome.
21. With respect to whether Plaintiff's job of assembling cardboard boxes caused or significantly contributed to the development of her carpal tunnel syndrome, Dr. Appert opined, "it certainly can contribute to her carpal tunnel syndrome and it can cause carpal tunnel syndrome." When asked if it did in this case cause carpal tunnel syndrome, Dr. Appert responded, "Well, it can cause it." He opined that one does not have to use vibratory equipment or a screw gun to get carpal tunnel syndrome and that assembling boxes all day could cause it. He further opined after being given a job description, that if Plaintiff was asymptomatic before *Page 9 
she began work with ASC Signal, based on the job description the employment caused carpal tunnel syndrome.
22. Considering the totality of Dr. Appert's opinion testimony, the Full Commission finds that it may be sufficient to prove that Plaintiff's job duties while working for ASC Signal significantly contributed to the development or aggravation of her carpal tunnel syndrome, but he did not offer a clear opinion on whether the duties performed by Plaintiff at ASC Signal placed her at an increased risk for the development carpal tunnel syndrome over the general public.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In Rutledge v. Tultex Corp./King's Yarn, the Supreme Court of North Carolina held that in order for an occupational disease to be compensable under the North Carolina Workers' Compensation Act, a plaintiff must prove that the claimed disease is: "(1) characteristic of persons engaged in the particular trade or occupation in which the [plaintiff] is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the [plaintiff's] employment."Rutledge v. Tultex Corp./King's Yarn,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). In cases where the employment exposed the worker to a greater risk of contracting the disease than the general public, the first two elements are satisfied.Rutledge, 308 N.C. at 93-94, 301 S.E.2d at 365.
2. Plaintiff has failed to meet her burden of proving that her employment duties while working at ASC Signal placed her at an increased risk for contracting bilateral carpal *Page 10 
tunnel syndrome over that of the general public. Therefore, Plaintiff has not proven that her bilateral carpal tunnel syndrome is a compensable occupational disease. N.C. Gen. Stat. § 97-53(13);Rutledge, 308 N.C. at 93-94, 301 S.E.2d at 365.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits is DENIED.
2. Each side shall bear its own costs.
This the ___ day of February 2011.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER